# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 20-1705V
### Filed: September 25, 2023

---

BILL TACKETT, JR.,

                Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

                Respondent.

Special Master Horner

---

*Michael R Herron, II, Law Offices of Michael R. Herron, Tampa, FL, for petitioner.*
*Andrew Henning, U.S. Department of Justice, Washington, DC, for respondent.*

## FINDING OF FACT[1]

On November 30, 2020, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that he suffered a Table Injury of Shoulder Injury Related to Vaccine Administration ("SIRVA") following an influenza ("flu") vaccination he received on October 1, 2019. (ECF No. 1.) On June 29, 2023, petitioner moved for a Finding of Fact that he suffered residual effects of his injury for at least six months. (ECF No. 66.) For the reasons set forth below, I conclude that petitioner has demonstrated by preponderant evidence that he suffered pain, weakness, and reduced range of motion of his right shoulder for greater than six months following the vaccination at issue.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

## I.    Procedural History

This case was initially assigned to the Special Processing Unit ("SPU") but was reassigned to the undersigned on December 30, 2022.  (ECF Nos. 13-14, 55-56.)  Petitioner filed medical records and an affidavit marked as Exhibits 1-12 over the course of about a year and a half and ultimately filed a Statement of Completion on March 14, 2022.  (ECF No. 37.)  Respondent then filed his Rule 4 Report on July 7, 2022.  (ECF No. 40.)  Based on respondent's objections and his own review of the record, the Chief Special Master then issued an Order to Show Cause, requiring petitioner to remedy several deficiencies and, pertinent to the instant motion, to file additional evidence supporting residual effects of his injury persisting until at least April 9, 2020.[3]  (ECF No. 41.)  Petitioner then filed additional exhibits marked as Exhibits 13-19 and ultimately an Amended Statement of Completion on October 21, 2022.  (ECF No. 52.)  However, respondent maintained his position, and so the case was reassigned out of the SPU. (ECF Nos. 54, 55.)

After the case was reassigned, I held a status conference with the parties, during which I further discussed the statutory six-month severity requirement.  (ECF No. 57.)  I noted that petitioner ended physical therapy less than five months after his vaccination and then his medical records reflect a nearly ten-month gap in medical care.  (*Id.* at 1.)  By the time petitioner returned to any physician, he was reporting injuries due to a bicycle accident.  (*Id.*)  I urged the parties to confer regarding what discovery might be appropriate.  (*Id.* at 2.)  Petitioner then filed two further affidavits and the parties deposed petitioner's physical therapist, who also produced additional documents.[4] (Exs. 20-22.)  Petitioner also filed an expert report by orthopedist Asif Ilyas, M.D., that was not given any exhibit designation.  (ECF No. 59.)  Thereafter, the parties confirmed that the six-month severity issue is ripe for a finding of fact.  (ECF No. 65.)

Petitioner filed his motion seeking a finding of fact regarding the six-month severity issue on June 29, 2023.  (ECF No. 66.)  Respondent filed a response on July 28, 2023.  (ECF No. 67.)  Petitioner filed his reply on August 11, 2023.  (ECF No. 68.)

In light of the above, I have determined that the parties have had a full and fair opportunity to develop the record on this issue and that, given the parties' assent, it is appropriate to resolve this issue on the existing record.  *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366

---

[3] It is not clear why the Chief Special Master chose this specific date.  Petitioner was vaccinated on October 1, 2019, and alleges an immediate onset of symptoms.  Nothing in respondent's report or the subsequent Order to Show Cause indicates a different onset.  Based on my review, April 1, 2020, marks six months from the date of onset of petitioner's alleged injury.  In any event, the difference would not change the result based on the analysis below.

[4] When petitioner initially filed the physical therapist's records as Exhibit 22, they did not contain the therapist's e-mail records.  (ECF No. 63-1.)  Petitioner subsequently re-filed an amended Exhibit 22 that included the additional e-mails.  (ECF No. 64-1.)  All references to Exhibit 22 in this document refer to the amended version of the exhibit as filed at ECF No. 64.

(Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").  Accordingly, petitioner's motion is now ripe for resolution.

## II.    Summary of Record Evidence

### a.  Medical Records[5]

Prior to vaccination, petitioner had other chronic pain complaints for which he treated with a pain specialist, including prior right shoulder pain and decreased range of motion.  (Ex. 7.)  However, a record of May 15, 2019, suggests petitioner's prior right shoulder pain had resolved by that time.  (*Id.* at 182.)  The vaccination at issue occurred on October 1, 2019.  (Ex. 4, p. 23.)

On October 21, 2019, petitioner called the Veteran's hospital with a complaint of right arm pain following his vaccination.  (Ex. 13, pp. 711-12.)  He complained of both weakness and numbness in the right arm, noting he had been unable to lift any weight. (*Id.* at 712.)  He also had numbness in two fingers.  (*Id.* at 711-12.)  Petitioner requested an MRI due to concerns about soft tissue injury, but his primary care provider ordered a nerve conduction study instead and directed petitioner to go to the emergency department if his symptoms worsened.  (*Id.* at 712.)  Petitioner followed up with his primary care provider three days later, on October 24, 2019. (Ex. 6, p. 539.)  Petitioner reported pain with weightlifting and push-ups, but he denied numbness.  (*Id.*) Confusingly, the record both indicates that petitioner denies weakness and that he "has recognized increased weakness."  (*Id.*)  Based on his own research, petitioner was concerned he had a soft tissue injury due to injection into his shoulder bursa.  (*Id.*) However, physical examination was normal.  (*Id.* at 541, 543.)  Petitioner was referred to physical therapy, but otherwise advised to use non-steroidal anti-inflammatories. (*Id.* at 543.)

Petitioner presented for a physical therapy evaluation on January 15, 2020.  (Ex. 3, pp. 25-26.)  He reported sudden soreness, weakness, and swelling of the right arm following vaccination and a "near inability to move right arm."  (*Id.* at 25.)  He indicated that his condition had improved over the last three months, but his shoulder "still feels 'tight' throughout RUE motions."  (*Id.*)  Physical exam confirmed weakness and reduced range of motion.  (*Id.* at 26.)  Petitioner had a good rehabilitation potential and eight weeks of physical therapy was recommended.  (*Id.* at 26-27.)  He later had a right shoulder MRI on February 6, 2020, which showed mild supraspinatus and infraspinatus tendinopathy without a tear, mild intra-articular long head biceps tendinopathy, and a SLAP tear.  (Ex. 5, pp. 4-5.)

Petitioner attended seven physical therapy sessions, which ended on February 28, 2020.  (Ex. 3, pp. 23-24, 29-34.)  At the last encounter, he was reportedly "feeling pretty good" and "with excellent mobility of [the] glenohumeral joint at this time passively

---

[5] Although the medical records have been reviewed and considered in their entirety, only those bearing on the specific question of the duration of petitioner's alleged post-vaccination symptoms are discussed.

but [he] does have 'soreness' at [the] end of range." (*Id.* at 34.)  It was further noted that petitioner was "tolerating treatment well this date, will continue." (*Id.*)

On March 9, 2020, petitioner presented to his pain management specialist complaining of right shoulder pain "described as mechanical – catching, numbness and worsening.  Episodes occur in the afternoon." (Ex. 7, p. 242.)  Physical exam confirmed decreased range of motion. (*Id.* at 243.)  Importantly, however, these notations are consistent with the notations from petitioner's prior, pre-vaccination encounters for the same condition. (*Compare* Ex. 7, pp. 242-43 (March 9, 2020 encounter), *with* Ex. 7, pp. 180-81 (May 15, 2019 encounter).)

Later records indicate petitioner reported testing positive for Covid-19 as of April 27, 2020. (Ex. 13, p. 455.)  He enrolled in telehealth monitoring. (*Id.* at 436-55.)  Call notes from that monitoring indicate that he reported on May 6, 2020, that he had completed a chalk drawing; on May 8, 2020, that he had been doing yard work; and on May 11, 2020, that he had been doing "crunches, push-ups, and weight training." (*Id.* at 441-47.)  A September 22, 2020 telehealth appointment discusses petitioner's low back pain and need for pain medication, but there is no specific reference to his shoulder. (*Id.* at 356-58.)

On September 29, 2020, petitioner presented to the emergency department following a bicycle accident wherein he was "clotheslined" by a rope stretched across his path. (Ex. 14, p. 41.)  He had fallen backward off his bicycle and reported pain in his neck as well as right shoulder pain, posteriorly and laterally. (*Id.*)  Physical exam demonstrated mild lateral right shoulder tenderness with limited abduction. (*Id.* at 43.)  Petitioner declined x-rays and was instructed to follow up with his primary care provider. (*Id.* at 44.)  On November 28, 2020, petitioner followed up with his internist complaining of ongoing neck and shoulder pain that he attributed to his bicycle accident, asking if physical therapy would be appropriate. (Ex. 13, p. 331.)

Ultimately, on January 4, 2021, petitioner returned to the same physical therapist he had seen previously. (Ex. 3, pp. 37-38.)  Petitioner reported that he was "in his usual state of health" when his bicycle accident occurred. (*Id.* at 37.)  Under "prior functional level," petitioner reported "getting into great shape during SIRVA-COV2 outbreak, biking several miles, running a 5k, and swimming nearly daily." (*Id.*)  He reported ongoing neck and shoulder pain for the past three months since the accident. (*Id.*)  Under "pertinent medical history," the physical therapist recorded "Hx of right shoulder pain from flu injection over a year ago." (*Id.*)  Under "relative comorbidities," he recorded "hx of right shoulder dysfunction from side effect reaction of flu shot." (*Id.*)

Petitioner had an MRI of the right shoulder on February 23, 2021, which confirmed acromioclavicular edema and partial tendon tearing (Ex. 17, p. 3.); however, as of March 4, 2021, the physical therapist recorded that petitioner had overall improvement with right shoulder strength, mobility, and range of motion, despite ongoing scapular weakness that raised a suspicion for a peripheral nerve injury and/or radiculopathy from the neck related to his bicycle accident (Ex. 3, p. 56.).

On September 29, 2021, petitioner would again return to the physical therapist. (Ex. 3, p. 11.)  This time he complained of bilateral shoulder pain "for the better part of several weeks."  (*Id.*)  He reportedly had "no difficulty with shoulder motion over the past year," though his prior history of post-vaccination shoulder pain is noted.  (*Id.*)  Petitioner's bilateral shoulder pain was attributed to overtraining.  (*Id.* at 12.)  The physical therapist noted that petitioner was doing the exact same exercises six days a week.  (*Id.*)  He was discharged from physical therapy with a home exercise plan as of October 29, 2021.  (*Id.* at 21.)

Petitioner would continue to periodically reference right shoulder pain in his later encounters; however, the remainder of the records are not informative of the specific issues addressed herein.

b.  Petitioner's Affidavits

In his first affidavit, petitioner indicated, "I still have pain, weakness and numbness in the affected shoulder."  (Ex. 11, p. 3.)  However, he did not address any of the specifics of his history subsequent to his final physical therapy session on February 28, 2020.  (*Id.*)

In a later-filed amended affidavit, petitioner indicates that, upon concluding physical therapy in February of 2020, he was instructed to continue with his home exercises and that he did continue until April of 2022.  (Ex. 18, p. 3.)  He further indicates his pain never went away entirely and his entire range of motion has not returned.  (*Id.*)  He stresses that the injury from his bicycle accident is "new and distinct" from his prior vaccination injury and that the pain from his accident "was different than the pain from the vaccination injury."  (*Id.*)

Petitioner has provided a separate affidavit indicating that he was assigned home exercises by his doctor at the VA when he first presented for care of his vaccine injury. (Ex. 15, p. 2.)  He indicates that he was instructed to continue these exercises subsequent to completing physical therapy and he created a daily log to keep track of his exercises.  (*Id.*)  The handwritten log is attached to the affidavit.  It is titled "Home PT Log for R Arm" and has three columns for three different exercises, "Pec Stretch," "Scap Stretch," and "Table Slides."  (*Id.* at 3.)  The first date of exercise is October 29, 2019. (*Id.*)  Thereafter, these exercises are listed approximately every two to three days through May 16, 2020.  (*Id.*)  Repetitions primarily vary between 3 and 4 for the Pec and Scap stretches and between 4 and 5 for the Table Slides.  (*Id.*)  Thereafter, the headings change to "Shldr Rot," "Iso Shld," and "Pec Door," and indicate a higher number of repetitions.  (*Id.*)  As petitioner indicates in his amended affidavit, listed exercises continue into April of 2022.  (*Id.* at 5.)

c.  Physical Therapist's Testimony and Records

Petitioner's physical therapist testified at a deposition taken on May 10, 2023. (Ex. 23.)  When asked why petitioner stopped coming to physical therapy after February 28, 2020, the physical therapist referenced his call logs filed separately as Exhibit 22. Initially, petitioner called to cancel due to having a cold; however, as of March 23, 2020, petitioner indicated that he was cancelling to comply with social distance guidelines relating to Covid-19.  (Exs. 23, p. 23; 22.)  The physical therapist characterized this as a "self-discharge" as opposed to a formal discharge.  (Ex. 23, p. 44.)  At that time, continued physical therapy was recommended.  (*Id.* at 54.)  The therapist explained that about half of his patients similarly stopped coming to physical therapy around that time due to the pandemic.  (*Id.* at 23.)

The physical therapist confirmed that he had given petitioner a home exercise plan earlier in the course of his physical therapy, adding that petitioner "was very adamant about his home exercises."  (*Id.* at 23-24.)  More specifically, he recalled giving him isometric exercises.  (*Id.* at 41.)  He confirmed that pec stretches, scapular stretches, and table stretches (as reflected in petitioner's own exercise log) would be within the standard of care, though he did not specifically confirm recommending those particular exercises to petitioner.  (*Id.* at 41-43, 45.)  Ordinarily, home exercises would be reflected in the plan of care within the records; however, keeping up additional, very easy home exercises, such as table slides, is something he might tell a patient in passing.  (*Id.* at 42-43.)  However, the physical therapist confirmed he would not recommend doing the same exercises every day.  (*Id.* at 50-51.)

When initially asked if he knew whether petitioner continued the home exercise plan after February 28, 2020, the physical therapist stated, "Yes, I know he did because he requested more exercises.  And then when I saw him about a year later, you know, we went over his exercises and I printed out more exercises because he very much appreciated a list of exercises that he can perform at home."  (*Id.* at 24.)  However, neither the call logs nor e-mail records provided by the physical therapist indicate any contact with petitioner between March 23, 2020, and his return for care of his bicycling injury in January of 2021.  (Ex. 22.)  The e-mail records instead indicate that petitioner began e-mailing the physical therapist for additional home exercise documents in July of 2022, and that petitioner needed to document his home exercises for his "historical file to show the types of exercises I tried."  (*Id.* at 2-4.)  On cross-examination, the physical therapist clarified that he "assumed" petitioner was doing exercises after his self-discharge and was unable to specifically recall prescribing home exercise to petitioner upon discharge.  (*Id.* at 44-45.)

Regarding petitioner's return to the physical therapy on January 4, 2021, the therapist explained that "in terms of my physical evaluation that day, I was very much looking at his clothesline injury [referring to the bicycle accident].  And, I mean, it would be difficult for me to say conclusively if that pain was the clothesline versus the old injury, but he did 100 percent, you know, report that he still had this injury [from] a year ago."  (*Id.* at 29.)  The physical therapist explained that this is why the post-vaccination

shoulder pain is documented under "relative comorbidity," because "I have to kind of remember that when I'm treating him now for a clear different injury, that clothesline, and remember that he also had a lot of soreness and pain from this particular injury." (*Id.* at 26-27.)

### d. Additional Witness Statements

Petitioner's wife provided an affidavit marked as Exhibit 20.  She recalls that petitioner did not get better following his physical therapy.  She indicates that their son was completing his Eagle Rank in Boy Scouts and petitioner was unable to do the necessary projects with him, despite having previously been involved in scouting activities.  She also recalls that petitioner became unable to do yard work, particularly mowing, as well as driving and washing dishes.  She remembers having to drive for an entire 8-hour trip to see her mother in May because petitioner was unable to drive.

Ken Gattshall, a friend of petitioner, provided an affidavit marked as Exhibit 21. In pertinent part, he states that petitioner "called me just a few days after he had a bicycle accident in a park.  He was telling me about his shoulder hurting from a shot he had received [too] high on his shoulder that was bothering him on top of getting close lined [sic] by a rope . . . ." (Ex. 21, p. 1.)

### e. Dr. Ilyas's Report

Dr. Ilyas indicates that he both reviewed petitioner's medical records and spoke with petitioner directly.  (ECF No. 59, p. 2.)  Dr. Ilyas opines that petitioner's post-vaccination symptoms, including constant pain, swelling, burning, and weakness, are consistent with myositis of the deltoid musculature, which he opines is consistent with SIRVA.  (*Id.* at 3.)  This is in contrast to what he views as more mechanical, preexisting conditions documented in the medical records.  (*Id.* at 3-4.)  Dr. Ilyas purports to link petitioner's ongoing symptoms as of the date of their conversation (October 7, 2022) to his alleged SIRVA; however, Dr. Ilyas acknowledges petitioner suffered an unrelated injury due to his bicycle accident and does not otherwise address petitioner's subsequent medical history.  (*Id.* at 4.)

## III.   Legal Standard

In order to state a claim for a vaccine-related injury under the Vaccine Act, a vaccinee must have either:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

§ 300aa-11(c)(1)(D).  In this case, only the first of these conditions is potentially met.

Neither "residual effects" nor "complication" is defined within the Vaccine Act itself.  *See* § 300aa-33.  However, in *Wright v. Secretary of Health & Human Services*, the Federal Circuit described these terms as follows: "'Residual' suggests something remaining or left behind from a vaccine injury.  An effect that is 'residual' or 'left behind' is one that never goes away or that recurs after the original illness."  22 F.4th 999, 1005 (Fed. Cir. 2022) (internal citation omitted).  A "complication," however, is a "morbid process or event occurring during a disease which is not an essential part of the disease, although it may result from it."  *Id.* at 1006.  "Read together, 'residual effects' and 'complications' appear to both refer to conditions within the patient, with 'residual effects' focused on lingering signs, symptoms, or sequalae characteristic of the course of the original vaccine injury, and 'complications' encompassing conditions that may not be 'essential part[s] of the disease' or may be outside the ordinary progression of the vaccine injury."  *Id.* (alteration in original).

Because the complication or residual effect must be "of such illness, disability, injury, or condition," the traditional tort concepts of causation apply, and the vaccine injury must be both a but-for cause and substantial contributing factor to the complication or residual effects at issue.  *Id.* at 1004-05.  The Vaccine Act prohibits a special master from ruling for petitioner based solely on his allegations unsubstantiated by medical records or medical opinion.  § 300aa-13(a)(1).  However, "the function of a special master is not to 'diagnose' vaccine-related injuries, but instead to determine 'based on the record evidence as a whole and the totality of the case,'" whether causation has been demonstrated.  *Andreu ex rel. Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1382 (Fed. Cir. 2009) (quoting *Knudsen ex rel. Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 549 (Fed. Cir. 1994)).  Special masters are not bound by the reports, summaries, or conclusions contained in the medical records.  § 300aa-13(b)(1).  Rather, the special master must consider the entire record.  *Id.*

A petitioner must prove by a preponderance of the evidence the factual circumstances surrounding his claim.  *See* § 300aa-13(a)(1)(A).  However, not every element of petitioner's claim needs to be specifically supported by medical records or opinion.  For example, onset of an injury may be determined to be consistent with the Vaccine Injury Table even when the first symptom or manifestation "was not recorded or was incorrectly recorded as having occurred outside such period."  § 300aa-13(b)(2).  The fact of a vaccination also need not itself be proven by medical records or medical opinion.  *See, e.g.*, *Wonish ex rel. Wonish v. Sec'y of Health & Human Servs.*, No. 90-667V, 1991 WL 83959, at *4 (Cl. Ct. Spec. Mstr. May 6, 1991) (stating, with regard to § 300aa-13(a)(1), that "it seems obvious then that not all elements must be established by medical evidence" and that "[v]accination is an event that in ordinary litigation could be established by lay testimony" as "[m]edical expertise is not typically required"); *Centmehaiey v. Sec'y of Health & Human Servs.*, 32 Fed. Cl. 612, 621 (1995) (noting that the "lack of contemporaneous, documentary proof of vaccination, however, does not necessarily bar recovery"), *aff'd*, 73 F.3d 381 (Fed. Cir. 1995).  The Federal Circuit has also observed, albeit in the context of attorneys' fees and costs, that "[w]hile lay

opinions as to causation or medical diagnosis may be properly characterized as mere 'subjective belief' when the witness is not competent to testify on those subjects, the same is not true for sworn testimony as to facts within the witness's personal knowledge, such as the receipt of a vaccine and the timing and severity of symptoms." *James-Cornelius v. Sec'y of Health & Human Servs*., 984 F.3d 1374, 1380 (Fed. Cir. 2021).

However, medical records do ordinarily "warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Human Servs.,* 993 F.2d 1525, 1528 (Fed. Cir. 1993). Thus, where subsequent testimony conflicts with contemporaneous medical records, special masters frequently accord more weight to the medical records. *See, e.g.*, *Reusser v. Sec'y of Health & Human Servs.,* 28 Fed. Cl. 516, 523 (1993) ("[W]ritten documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later."); *see also Vergara v. Sec'y of Health & Human Servs*., No. 08-882V, 2014 WL 2795491, *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recounted in later medical histories, affidavits, or trial testimony.").

Special masters are cautioned against favoring contemporaneous records "reflexively" and must not overemphasize individual records at the expense of a comprehensive evaluation of the entire record. *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 539-41 (2011). "[M]edical records are only as accurate as the person providing the information." *Parcells v. Sec'y of Health & Human Servs*., No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006). Moreover, "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." *Murphy v. Sec'y of Health & Human Servs*., 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir.), *cert. denied*, *Murphy v. Sullivan*, 506 U.S. 974 (1992).

There are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell ex rel. Campbell v. Sec'y of Health & Human Servs*., 69 Fed. Cl. 775, 779 (2006) (explaining that, "like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie v. Sec'y of Health & Human Servs*., No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting *Murphy*, 23 Cl. Ct. at 733)). However, when witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs*., No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (quoting *Blutstein v. Sec'y of Health & Human Servs*., No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)), *motion for review denied,* 142 Fed. Cl. 247, 251-52 (2019), *vacated on other grounds and remanded*, 809 F. App'x 843 (Fed Cir. 2020).

In *Kirby v. Secretary of Health & Human Services*, the Federal Circuit confirmed that it is not an error for a special master to find the severity requirement met where that finding is based on a collection of "plausible evidence." 997 F.3d 1378, 1381 (Fed. Cir. 2021). In that case, petitioner's medical records reflected active treatment of her condition for only a few months before she was released as having reached maximum medical improvement, though not entirely symptom free. *Id.* at 1380. Thereafter, the medical records were silent as to her alleged residual effects for the remaining duration of the six-month post-vaccination period. *Id.* However, petitioner testified that she continued a home exercise plan for more than a year. *Id.* at 1381. Her testimony was corroborated by documentation in the form of her retained home exercise sheet, a more remote return visit where the relevant symptoms were again reported, and an expert opinion confirming her reported symptoms were consistent with her injury. *Id.* The Federal Circuit concluded that where the medical records are silent, rather than contradictory, it was not error for the special master to credit the petitioner's corroborated testimony as evidence satisfying the six-month severity requirement. *Id.* at 1383-84.

## IV.    Party Contentions

Petitioner argues that he has provided preponderant evidence that his vaccine-related symptoms persisted for more than six months. (ECF No. 66.) Specifically, petitioner summarizes the record evidence as follows:

> Here we have a sworn affidavit of the petitioner stating that the symptoms of the vaccine injury lasted past the 6-month mark of April 1, 2020. This affidavit is supported by several different pieces of evidence. The OPPT [*i.e.*, physical therapist's] call log shows that Mr. Tackett stopped attending OPPT early due to COVID and not due to a resolution of the injury, the testimony of treating physician Kevin Hardy DPT that the best course of treatment for social distancing was the home exercises which he approved and that he had knowledge that Mr. Tackett was doing, the affidavits of Mr. Gattshall and Ms. Tackett which support the ongoing nature of the injury, the OPPT record from January 4, 2021 that lists the vaccine injury as a comorbidity, the expert report of Dr. Ilyas MD that renders a diagnosis and opines the symptoms of the vaccine injury lasted past the 6 month mark and the contemporaneously created exercise log. This evidence is more than adequate to demonstrate a rational connection between the facts and a ruling in Petitioner's favor.

(*Id.* at 10-11.)

Based on his review of the record, respondent disagrees that petitioner has presented preponderant evidence in satisfaction of the severity requirement. (ECF No. 67, p. 14.) Regarding his medical records, respondent stresses that petitioner stopped seeking treatment for his alleged injury in March of 2020, less than six months post-

vaccination; that despite the Covid-19 pandemic his telehealth records from May of 2020 not only fail to mention shoulder pain, but also reflect activities such as weight training and yard work; and that subsequent references to shoulder pain in his medical records are attributable to his subsequent bicycle accident.  (*Id.* at 10-11.)  Regarding the other evidence of record, respondent stresses that petitioner's affidavit alone cannot meet his burden of proof; that the affidavits suffer important inconsistencies; and that the exercise log, which itself reflects inconsistencies with other record evidence, is witness assertion with no corroboration in the medical records.  (*Id.* at 11-2 (citing *Freeman v. Sec'y of Health & Human Servs.*, No. 20-215V, 2022 WL 2387572 (Fed. Cl. Spec. Mstr. May 31, 2022).)  Respondent focuses on that aspect of the physical therapist's testimony that contradicts petitioner's assertions regarding his home exercises.  Accordingly, respondent suggests the testimony supports the absence of any SIRVA sequelae lasting six months. (*Id.* at 13-14.)

In reply, petitioner stresses that the scope of this motion is limited to a finding as to the six-month severity issue. (ECF No. 68.)  Petitioner asserts that respondent has no basis to challenge his veracity.  He further stresses the circumstances posed by the Covid-19 pandemic and seeks to rebut several of the specific inconsistencies raised by respondent.  (*Id.*)

## V.    Discussion

Petitioner has filed an expert report by orthopedist Asif Ilyas, M.D., causally linking petitioner's symptoms to his alleged injury (ECF No. 59); however, the nature of petitioner's alleged injury and the question of whether any of petitioner's symptoms were vaccine-caused, whether by Table Injury presumption or demonstration of causation-in-fact, remains to be addressed by further litigation.  Nonetheless the medical records do clearly reflect that petitioner was treated for pain, weakness, and reduced range of motion of his right shoulder that he attributed to his vaccination and respondent has raised no objection to resolving the severity requirement question based on the presence of those reported symptoms.  Thus, the issue addressed at this juncture is simply whether those alleged symptoms persisted for at least six months post-vaccination, *i.e.*, until at least April 1, 2020, without reaching the significance of those symptoms to petitioner's overall claim.

Petitioner's last physical therapy appointment for these symptoms was February 28, 2020, or very nearly five months post-vaccination.  (Ex. 3, pp. 24-34.)  Importantly, however, both the resulting medical record and the physical therapist's testimony confirm that petitioner had not reached his maximum recovery and that further physical therapy was recommended.  (*Id.* at 34; Ex. 23, pp. 44, 55.)  Thus, medical record evidence confirms ongoing symptoms of petitioner's alleged injury with only one month of the requisite period remaining.[6]  Further to that, although petitioner cancelled several

---

[6] An encounter with petitioner's pain management specialist on March 9, 2020, subsequently purported to confirm ongoing pain and reduced range of motion, including by physical examination, though this record is not strong evidence given that it appears the relevant notations carry over from prior encounters regarding petitioner's pre-existing complaints.  (Ex. 7, pp. 242-43.)

appointments in early March of 2020, the physical therapist's contemporaneously created call evidences that, as of March 23, 2020, or just one week prior to the six-month mark at issue, petitioner still intended to resume physical therapy. (Ex. 22 (stating of his Covid-related cancellation that petitioner "will wait it out another week").)

In that regard, I do place significant weight on the disruptions caused by the Covid-19 pandemic as the reason petitioner stopped attending physical therapy when he did. Respondent argues that Covid-19 restrictions should not be persuasive as explaining petitioner's gap in treatment because the medical records show petitioner accessing other healthcare via telehealth appointments. (ECF No. 67, p. 10.) However, petitioner is persuasive in countering that physical therapy is a distinct context in which telehealth availability is not self-evident. (ECF No. 68, p. 3 (questioning whether telehealth physical therapy even exists).) In any event, the fact that petitioner stopped pursuing physical therapy due to social distancing guidelines is specifically confirmed by the physical therapist's contemporaneous records. (Ex. 22.) Moreover, the physical therapist testified that petitioner, and indeed half of his clients, stopped coming to physical therapy when social distancing guidelines began in March of 2020. (Ex. 23, p. 23.) Additionally, as noted above, both the medical records and the therapist's testimony confirm that further physical therapy had been recommended at the time of petitioner's last encounter. (*Id.* at 44, 55; Ex. 3, p. 34.)

Respondent cites several telehealth appointments during which petitioner reported activities, such as push-ups, weightlifting, yard work, and chalk drawing, that respondent views as incompatible with ongoing shoulder pain, weakness, and reduced range of motion. (ECF No. 67, p. 10 (citing Ex. 13, pp. 441, 444, 447).) To be sure, the notations highlighted by respondent speak to the severity of petitioner's symptoms. However, petitioner's prior medical records confirm that he had resumed physical activity despite still actively treating for pain, weakness, and range of motion issues. (Ex. 6, p. 539 (reporting pain with weightlifting and push-ups as of October 24, 2019); Ex. 3, p. 25 (reporting progress from near inability to move due to tightness with movement); Ex. 3, p. 34 (reporting increased pain after a sanding project).) Thus, these May 2020 notations are not incompatible with the continued presence of petitioner's complained-of symptoms. And, in any event, all of these notations reflect petitioner's condition in May of 2020, after the relevant six-month period. Accordingly, even if they were accepted as evidence weighing against ongoing symptoms at that time, they would still not demonstrate that symptoms resolved prior to April 1, 2020. Importantly then, none of petitioner's medical records contradict his allegation that symptoms of pain, weakness, and reduced range of motion persisted for at least six months. This is an important distinction. *See Kirby*, 997 F.3d at 1381.

I am, however, persuaded that respondent has raised reasonable concerns regarding the sufficiency of the affidavits and home exercise log as evidence supporting petitioner's allegations regarding the severity requirement. These accounts present inconsistencies compared to the other record evidence, requiring further explanation before they can be credited. For example, petitioner's wife's affidavit specifically asserts that he was unable to do yardwork whereas the contemporaneous medical

records indicate that he was doing yardwork.  (*Compare* Ex. 20, *with* Ex. 13, pp. 441-
47.)  Although petitioner indicates the home exercises that he logged were initially
directed by his primary care physician, respondent is also persuasive in noting that the
exercises petitioner documented are not entirely consistent with the advice he was
subsequently given by the physical therapist.  Moreover, it is notable that his
documented routine was not significantly disrupted following his later bicycle accident
despite that accident having resulted in a new right shoulder injury.  (Ex. 15, p. 4; Ex.
23, pp. 24, 41-42, 44-45, 50-51.)  Accordingly, it is not clear exactly what relationship
these exercises bore to petitioner's symptoms.  Without providing respondent an
opportunity to cross-examine the witnesses, this evidence is not entitled to significant
weight and does not contribute to the outcome.

Nonetheless, the record also contains the deposition testimony of petitioner's
physical therapist, a disinterested witness who was subject to cross-examination.  (Ex.
23, pp. 51-53.)  The physical therapist provided testimony clarifying the January 4, 2021
physical therapy record that discusses both petitioner's prior vaccine-attributed shoulder
complaints and his separate injuries from his bicycle accident.  At that time, petitioner
was seeking care for his bicycling injury, but the record also documents right shoulder
pain as a relevant history and right shoulder dysfunction as a comorbidity.  (Ex. 3, p.
37.)  Although the physical therapist acknowledged that, as of petitioner's return to
physical therapy, he could not distinguish petitioner's prior shoulder pain from the
effects of his bicycle accident (Ex. 23, p. 29), this is not the full scope of the therapist's
testimony.  The physical therapist testified that, as part of the January 4, 2021
encounter, he received a history from petitioner that indicated his post-vaccinal shoulder
symptoms had persisted up to the time of his bicycle accident.  (*Id.* at 28-29.)  Although
he did not have perfect recall of all of the events discussed during his deposition,
seeming to misremember when petitioner asked for documentation of his home
exercises, he did testify that his recollection of the history petitioner provided at that
encounter was "100 percent."  (*Id.*)  He also specifically explained that this history is the
reason his record includes petitioner's alleged post-vaccination injury as a condition
comorbid to his bicycling injury in the resulting record.  (*Id.* at 26-27.)  Moreover, the
physical therapist explained why the history of post-vaccinal shoulder pain persisting
until the time of the bicycle accident remained important to the January 4, 2021
assessment and treatment plan, despite the fact petitioner was seeking treatment for a
new injury.  (*Id.*)  This testimony confirms that the inclusion of petitioner's prior post-
vaccinal shoulder dysfunction as a comorbidity in the January 4, 2021 record should be
accorded weight as a contemporaneous treatment notation, albeit in a record pertaining
to a different injury.  *Cucuras*, 993 F.2d at 1528 (explaining that medical records are
trustworthy in part because, "[w]ith proper treatment hanging in the balance, accuracy
has an extra premium").

Accepting the physical therapist's testimony regarding the pre-accident history
petitioner provided to him is distinct from accepting that petitioner has demonstrated
that any of his post-bicycle accident shoulder complaints are attributable to his alleged
SIRVA.  On the current record, there is not preponderant evidence to support that any
of petitioner's right shoulder complaints subsequent to September of 2020, including

both those attributed to his bicycle accident and his later return for further physical therapy due to over-training in September of 2021, are causally related to his prior, post-vaccination shoulder symptoms. The physical therapist confirmed that, once the bicycle accident occurred, it was no longer possible to distinguish the underlying cause of petitioner's shoulder complaints. (Ex. 23, p. 26.) Additionally, as discussed above, respondent has raised several notations from May of 2020 that suggest petitioner's symptoms were not interfering with daily activities at that time. In that regard, the physical therapy records further reflect that, prior to the bicycle accident, petitioner reported that he was "in his usual state of health" when his bicycle accident occurred. Under "prior functional level," petitioner reported "getting into great shape during SIRVA-COV2 outbreak, biking several miles, running a 5k, and swimming nearly daily." (Ex. 3, p. 37.) Moreover, petitioner did not specifically raise any issue of shoulder pain during his September 22, 2020 telehealth appointment wherein he otherwise discussed his pain medication needs. (Ex. 13, pp. 355-59.) Thus, although there is preponderant evidence that petitioner suffered residual pain and shoulder dysfunction beyond six months from the date of vaccination for all the reasons discussed herein, the record evidence strongly suggests that, by the time of the bicycle accident, the remaining symptoms were very mild and not interfering with petitioner's daily activity. Dr. Ilyas's report is inadequate to address this point, even as it purports to suggest that all of petitioner's symptoms through October of 2022 are related to his alleged SIRVA.

## VI.    Conclusion

Considering all of the above, there is preponderant evidence that petitioner's right shoulder pain and reduced range of motion persisted for at least six months post-vaccination, or beyond April 1, 2020. Specifically, medical record evidence confirms that petitioner's injury was unresolved as little as about a month short of the requisite time period, contemporaneous records and additional testimony confirm treatment stopped prematurely due to the Covid-19 outbreak rather than resolution of the injury, and a disinterested witness provided evidence, both testimonial and in his contemporaneously created record, that petitioner subsequently reported in the context of seeking care for a separate neck and shoulder injury that his shoulder pain and dysfunction had persisted up until the point of his bicycle accident occurring in September of 2020. None of petitioner's other medical records are to the contrary, though they do tend to show his ongoing residua was mild enough that it was not interfering with his activities of daily life. The witness affidavits and petitioner's exercise log do not factor into this analysis as I have not resolved the credibility challenge raised by respondent.

**IT IS SO ORDERED.**

<u>**s/Daniel T. Horner**</u>
Daniel T. Horner
Special Master